WALTER E. HELLER & COMPANY, Inc., Plaintiff,

v.

Ralph COX, Jr., Defendant.

WALTER E. HELLER & COMPANY, Inc., Plaintiff,

v.

OCEAN AIR TRADEWAYS, a partnership, Defendant.

No. 66 Civ. 1437.

United States District Court, S. D. New York.

May 23, 1972.

Wachtell, Lipton, Rosen & Katz, New York City, for plaintiff by Herbert M. Wachtell, Bernard Mindich, New York City, of counsel.

Friedman & Friedman, New York City, for defendants by Castrataro, Herman & Beinin, George J. Castrataro, New York City, Bill Smalley, Tulsa, Okl., of counsel.

BAUMAN, District Judge.

In these consolidated actions plaintiff Walter E. Heller & Company, Inc. ("Heller") seeks to recover upon guaranties executed by defendants Ralph Cox, Jr. ("Cox") and Ocean Air Tradeways ("OAT") respectively, in connection with a $1.7 million loan made by Heller to United States Overseas Airlines, Inc. ("USOA") in November, 1962.

Plaintiff is a Delaware corporation which has its principal place of business in Illinois and does business in New York. Since neither defendant is a citizen of New York, Delaware or Illinois, and the amount in controversy exceeds $10,000, this Court has jurisdiction of these actions under 28 U.S.C. § 1332.

It is plaintiff's position that the defendants, by virtue of their respective guaranties, jointly and severally owe to plaintiff, as of January 22, 1972, the sum of $166,017.44.

The defendants, on the other hand, while not denying the execution of the guaranties in question, challenge the validity of the agreements and the extent, if any, of their outstanding liability to plaintiff.

The background of this controversy is as follows: On November 23, 1962, plain-

tiff entered into a written loan agreement with USOA and various affiliated companies and persons, including Air Power Overhaul, Inc., Ocean Air Tradeways, Inc., Canamex Corporation, and defendants COX and OAT. The loan agreement provided that plaintiff would lend $1,700,000 to USOA and that USOA would repay the loan plus pre-computed interest of $279,631.75 in 24 successive monthly installments of $69,000 each, beginning January, 1963, and a twenty-fifth installment of $323,631.75.

At the time of the loan, USOA executed a collateral installment note in the face amount of $1,979,631.75 reflecting the advance of the $1,700,000 plus interest. As security for the repayment of this indebtedness, USOA and each of the other parties to the loan agreement executed various instruments, including chattel mortgages and a deed of trust in favor of plaintiff.[1] In addition to requiring repayment of the principal sum of the loan with interest, the note provided for the payment of 12½% interest on each and every payment not timely made. The note also provided that in the event of default, USOA would pay all "exchange and collection charges and a reasonable sum as attorneys' fees if placed in the hands of an attorney for collection."

Contemporaneously with the making of the loan and the execution of the note, and in order to assist USOA in obtaining the Heller financing, defendants Cox and OAT executed and delivered to plaintiff their respective guaranties by which they each guaranteed:

" * * * the prompt payment in full * * * of any and all indebtedness, obligations and liabilities of every kind or nature (both principal and interest) * * * owing to [plaintiff] by [USOA] * * * and all expenses, collection charges, court costs and attorneys' fees incurred in endeavoring to collect or enforce any of the foregoing against [USOA] and/or [defendants] or any other person or concern liable thereon * *."

In addition, each defendant specifically waived all notices and rights with respect to the indebtedness and collateral to which guarantors are otherwise entitled.

USOA was in default under the loan agreement and note from the outset. The first installment of the loan was only partially paid, and thereafter not one installment was paid in its proper amount or when due. Nonetheless, Heller refrained from declaring a default until July, 1965. At that time, Heller accelerated the entire outstanding debt and began pursuit of collection by, among other things, the sale of collateral.

These sales however, were interrupted when USOA filed an application for an arrangement pursuant to Chapter XI of the Federal Bankruptcy Act in the District of New Jersey. Plaintiff then filed a Notice of Motion and Petition for leave to sell certain assets of USOA which were covered by the chattel mortgages. USOA, at the instigation and direction of Cox and OAT (acting by and through Cox), and with the financial support of

---

1. Contemporaneously with the execution of the loan agreement and note, USOA and its various affiliated companies executed and delivered to plaintiff as security for all USOA indebtedness to plaintiff the following security instruments:

  (a) A chattel mortgage by USOA to plaintiff covering 14 airplanes and all USOA's machinery and equipment at Cape May County Airport, Wildwood, New Jersey.

  (b) A chattel mortgage by USOA, defendant OAT and Canamex to plaintiff covering 69 airplane engines.

  (c) A chattel mortgage by Air Power to plaintiff covering Air Power's machinery and equipment located in San Leandro, California.

  (d) A chattel mortgage by Canamex to plaintiff covering one airplane.

  (e) A chattel mortgage by defendant OAT to plaintiff covering one airplane.

  (f) A deed of trust by OAT, Inc. covering approximately 5 acres of land and buildings thereon located at Oakland, California.

OAT, challenged plaintiff's right to conduct the sales and opened a full-scale attack on the validity of the indebtedness. Hearings were held before Referee Lipkin in November, 1966. Heller's Executive Vice President, Edmund Duncan, testified at length to all the relevant facts surrounding the loan and the status of the indebtedness as of November 15, 1966. The loan agreement, the collateral installment note, chattel mortgages, ledger cards, checks and correspondence were submitted in support of Heller's claim. Additionally, a large volume of documents was requested by and produced to counsel for USOA who then undertook a vigorous and extensive cross-examination of Duncan. Among other things, with the direct participation of Cox who was present throughout, he raised questions concerning the propriety of prior sales of collateral, the accuracy of plaintiff's computation of the outstanding indebtedness, the reasonableness of attorney's fees, the computation of interest, and a myriad of alleged improprieties by plaintiff. Every relevant transaction and every item of indebtedness then outstanding was subjected to scrutiny and challenge.

In connection with these proceedings, counsel for USOA propounded interrogatories to plaintiff requesting further information concerning defenses and counterclaims which were allegedly available to USOA. These interrogatories covered the negotiation and closing of the loan, payments made, the existence, condition, ownership and location of collateral, plaintiff's relationship and dealings with Twentieth Century Aircraft, prior sales of collateral by plaintiff, and plaintiff's actions with respect to the DC–4 aircraft N–90428. Plaintiff was required to and did answer the interrogatories, and a substantial volume of still additional documents were produced.

On January 18, 1967, Referee Lipkin rendered his "Findings of Fact, Conclusions of Law and Order" holding plaintiff's claim valid and establishing a lien in favor of plaintiff, as of November 15, 1966 (the date upon which testimony was commenced), in the amount of $152,232.07.

On March 15, 1967, Referee Lipkin entered an Order granting plaintiff's request to proceed with the sale of USOA's assets in Wildwood, New Jersey. This Order however, was entered without prejudice to USOA's right to assert counterclaims.

Several months after the Court's Order, USOA, on Cox's affidavit, sought to interpose certain counterclaims against Heller in the bankruptcy court as did OAT. They ranged from charges of mismanagement of collateral to usury and fraud. Referee Lipkin permitted the submission of the counterclaims and Heller responded in full. Thereafter, Cox failed on several occasions to appear for a trial of the counterclaims despite specific directions by Referee Lipkin. Finally, he dismissed them.

When Heller completed the sale of the major items of USOA collateral at a publicly held, well publicized, and well attended auction sale, a substantial deficiency remained. Accordingly, Heller brought these actions against defendants as guarantors of the USOA obligations.

After considering much of the evidence adduced at trial and the memoranda submitted by the parties, this Court made a preliminary determination that Referee Lipkin's Order adjudicating the validity of plaintiff's claim against USOA and his Order dismissing the counterclaims against Heller constituted final judgments against USOA which are *res judicata* in the present actions and conclusively bind each of the defendants as to (a) the question of the validity of Heller's loan, (b) any defenses now raised by defendants based on acts which allegedly occurred prior to November 15, 1966, and (c) the validity and extent of all charges made prior to November 15, 1966. Accordingly, the Court limited the trial to charges and credits since that day. In addition, defendants were permitted to raise defenses not asserted before Referee Lipkin.

The discussion which follows is intended to explain the preliminary determination of this Court and to resolve the questions which were tried to the Court.

## I.

◼ As is well known, the legal prerequisites to the application of the doctrine of *res judicata* are: (1) the existence of a final judgment rendered on the merits, (2) a subsequent action between the same parties or those in privity with them, and (3) the presence of the same claim or demand. See, e. g., Baltimore Steamship Co. v. Phillips, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 774 (1927); Saylor v. Lindsley, 391 F.2d 965 (2d Cir. 1968); In re Weisbrod & Hess Corp., 129 F.2d 114 (3d Cir. 1942). If these elements conjoin, the doctrine of *res judicata* operates to bind the parties both as to issues actually litigated and determined in the first suit, and those which might have been, but were not raised and decided. Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 195 (1877); Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948).

### (1) Prior Final Judgment on the Merits

◼ The law is settled that the judgment of a Referee in Bankruptcy with respect to a creditor's claim for money or for property is a final judgment and should be given the same effect as any other judgment of a competent court, in a subsequent suit against the bankrupt or any one in privity with him. See, e. g., Katchen v. Landy, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966); Lesser v. Gray, 236 U.S. 70, 35 S.Ct. 227, 59 L.Ed. 471 (1915); In re Weisbrod & Hess Corp., *supra;* United States v. American Surety Co., 56 F.2d 734 (2d Cir. 1932); United States v. Coast Wineries, Inc., 131 F.2d 643 (9th Cir. 1942).

◼ It is equally well settled that a dismissal for want of prosecution—unless explicitly provided to be without prejudice—is "with prejudice" and operates as an adjudication on the merits. Federal Rules of Civil Procedure 41(b) and (c); Larsen v. O'Reilly, 11 F.R.D. 604 (S.D.N.Y.1951). That is the case here.

### (2) The Same Parties or those in Privity with them

◼ The privity of interest necessary to bind a party to the results of a prior proceeding to which he was not a named party can be established in a number of ways. Thus, it is established when it is shown that the defendant in the subsequent action was an officer, director or the major shareholder of the corporate party in the first action. Towle v. Boeing Airline Co., 364 F.2d 590 (8th Cir. 1966); Hyman v. Regenstein, 258 F.2d 502 (5th Cir. 1958); cert. denied sub nom. Hyman v. Continental Illinois National Bank, 359 U.S. 913, 79 S.Ct. 589, 3 L.Ed.2d 575 (1959); In re Shea's Will, 309 N.Y. 605, 132 N.E.2d 864 (1956). See also 1B Moore's Federal Practice, Para. 0.411 at 1558. It may also be established by showing that the party who is sought to be bound by the first judgment was actually a participant in and controlled the prior litigation. See, e. g., Bros, Inc. v. W. E. Grace Mfg. Co., 261 F.2d 428 (5th Cir. 1958); Ark-Tenn Distributing Corp. v. Breidt, 209 F.2d 359 (3d Cir. 1954); 1B Moore's Federal Practice, Para. 0.411 [6]. Finally, a guarantor is bound by a prior adjudication involving the principal debtor if the guarantor had notice of and an opportunity to participate in the prior proceeding. See e. g., Broder v. Hartford Acc. & Indem. Co., 106 F. Supp. 343 (D.D.C.1952); Jonas & Naumburg Corp. v. Michlin, 220 App.Div. 649, 222 N.Y.S. 442 (1st Dep't. 1927); Blanding v. Cohen, 101 App.Div. 442, 92 N.Y.S. 93 (1st Dep't. 1905) aff'd. 184 N.Y. 538, 76 N.E. 1089. Cf. Frederick v. United States, 386 F.2d 481 (5th Cir. 1967).

◼ Applying these standards to the defendants it is clear that the necessary privity between each of them and USOA exists.

COX was the principal shareholder (71.33%), president and director of USOA. He was an active participant in, and was in full control of the USOA defense in the Chapter XI proceeding. He not only signed the Chapter XI petition on behalf of USOA, but retained its counsel and helped finance the retention. Finally, he was a guarantor of USOA's indebtedness to Heller, with notice of the proceedings before Referee Lipkin.

OAT was also an active participant in that proceeding. The evidence discloses that OAT helped to finance it and there sought to assert a claim against Heller. Moreover, defendant Cox, as the managing partner of OAT, had its interests very much in mind. The other two OAT partners were respectively, Cox's mother and brother. All were shareholders of USOA and in the aggregate owned 89.2% of its stock. Not only were the other partners of defendant OAT on notice of the Chapter XI proceedings, but they were consulted by Cox throughout the course of the proceedings. The various settlement negotiations during the course of the proceedings invariably contemplated the release by Heller of any claim against OAT on its guarantee. Under these circumstances, I conclude that not only was OAT on notice of the Chapter XI proceedings, but in fact was an active participant well aware that its liability was inevitably there being determined. Cf. United States v. Webber, 396 F.2d 381 (3d Cir. 1968).

### (3) The Same Claim or Demand

■ This prerequisite for applying the doctrine of *res judicata* merely requires that there be an identity of issues or grounds between the first and the second actions. See e. g., Wilson Cypress Co. v. Atlantic Coast Line R. Co., 109 F.2d 623, cert. denied, 310 U.S. 653, 60 S.Ct. 1101, 84 L.Ed. 1418 (1939). Since it is clear that the amount and validity of USOA's indebtedness to Heller was placed in issue by Heller's petition to sell its collateral, there can be no doubt that both the Chapter XI proceeding and the present litigation relate to the same claim or demand. That is not seriously contested.

■ Thus, since the "Findings" and the order dismissing counterclaims constitute final judgments against USOA which are *res judicata* in these actions, defendants are accordingly barred from raising anew any questions decided by Referee Lipkin. The defendants are specifically barred from (a) questioning the amount of the USOA indebtedness found to be existing as of November 15, 1966, (b) raising any defenses based on alleged usury, alleged violation of Section 131(1) of the New York Banking Law, McKinney's Consol.Laws. c. 2 or any rule against charging interest on interest, and (c) asserting any claim of discharge of their guaranties based on facts which allegedly existed prior to November 15, 1966, including any claims based on alleged lack of due diligence in the collection of the USOA indebtedness or the preservation of the collateral.

### II.

■ At trial defendants claimed, for the first time, that plaintiff committed a "fraud in the inducement" by misrepresenting to USOA and defendants that a separate guaranty obtained by Heller from Twentieth Century Aircraft ("Twentieth Century") was "the same as" defendants' guaranties except that it was "partial". They claimed that had they known that it was different they would not have executed their guaranties.

The evidence adduced at the trial does not support this contention. Although defendants asserted that they would prove such fraud through Cox and three other witnesses, only Cox and Frank Donahue testified that a representative of Heller made statements to that effect. Defendants' other witness, Sidney Dickstein, USOA's former counsel, said quite the contrary. He testified that during the loan negotiations plaintiff made clear that the Twentieth Century guaranty was materially different from the one signed by Cox and OAT and cor-

roborated plaintiff's witnesses Duncan and Ruben who testified that Donahue, a "sales manager," had not been privy to the negotiations. Additionally, Duncan and Ruben stated that they personally advised representatives of USOA of the differing nature of the Twentieth Century guaranty prior to the consummation of the loan. Having heard the testimony, I conclude that the defendants were fully notified that this guaranty differed materially from those signed by defendants.

### III.

Defendants also claim that after November 15, 1966 Heller failed to properly realize on the collateral and that, as a result, they are released from their obligations. The authorities agree that one who unconditionally guaranties an indebtedness is not released or discharged by virtue of any lack of diligence with respect to, or release or impairment of, collateral by a secured creditor. See e. g., Nation Wide, Inc. v. Scullin, 256 F.Supp. 929 (D.N.J.1966), aff'd, 377 F.2d 554 (3d Cir. 1967); United States v. Shirman, 41 F.R.D. 368, 372–73 (1966); United States v. Newton Livestock Auction Market, Inc., 336 F.2d 673 (10th Cir. 1964); Indianapolis Morris Plan Corp. v. Karlen, 28 N.Y.2d 30, 319 N.Y.S.2d 831, 268 N.E.2d 632 (1971). Here defendants' guaranties are unconditional guaranties of payment. They specifically provide that:

"[Defendant unconditionally guarantee[s] to [plaintiff] * * * the prompt payment in full at maturity and all times thereafter * * * any and all indebtedness, obligations and liabilities of every kind or nature (both principal and interest) now or at any time hereafter owing to [plaintiff] by [USOA] * * *.

* * *. The [defendant] * * * waive(s) notice of any consents to the granting of indulgence or extention of time payment, the taking and releasing of security in respect of any * * agreements, obligations, indebtedness or liabilities so guaranteed hereunder,

or [plaintiff's] accepting partial payments thereon or [plaintiff's] settling, compromising or compounding any of the same in such manner and at such times as [plaintiff] may deem advisable, without in any way impairing or affecting [defendant's] liability for the full amount thereof; and [plaintiff] shall not be required to prosecute collection, enforcement or other remedies against the debtor, or against any person liable on any said * * * agreements, obligations, indebtedness or liabilities so guaranteed, or to enforce or resort to any security, liens, collateral or other rights or remedies thereto appertaining, before calling on [defendant] for payment; nor shall [defendant's] liability in any way be released or affected by reason of any failure or delay on [plaintiff's] part so to do.

This guaranty is absolute, unconditional and continuing * * *."

In addition, I find that defendants' claim is factually baseless. There has been no credible showing that plaintiff was in any way responsible for any dissipation of value or that any of plaintiff's activities resulted in the realization of anything less than the fair value of the collateral sold. All the evidence is to the contrary and tends to show that plaintiff sought to maximize its receipts from such sales. Plaintiff proved that the sale of collateral at Wildwood was well publicized, well attended and properly conducted. Cox's claim that 30 of his "personal" antique street lamps were improperly sold was specifically contradicted by defendants' own witness, Andrea Lippi.

Similarly, Cox's claim that Heller permitted the deterioration of a DC–4 aircraft (N–90428) located in Miami, Florida was specifically refuted by Dan Cox who testified that the plane was little more than a hulk and was subject to possessory liens for storage and gasoline.

Finally, defendants' claim that Heller improperly dealt with a DC 54 aircraft

(N–44994) located in Oakland, California is wholly unsubstantiated by the record. The evidence shows that the plane was nearly worthless by 1965 when Heller attached it, and that Heller reasonably concluded that its value was not worth the costs that would be expended in pursuing a sale.

## IV.

■ Defendants have claimed that the interest rate on their outstanding indebtedness should be limited to 6% per annum because that was the rate utilized by Referee Lipkin in his Findings of Fact, Conclusions of Law and Order in the Chapter XI proceedings. The agreements involved here, however, obligate the defendants to pay interest at 12½% per annum on all post maturity sums owing under the note and agreement which were guaranteed by defendants. The fact that Referee Lipkin limited the rate for his purposes can have no effect here since his Order was limited to the Chapter XI proceedings.

## V.

■ Defendants also contend that as of February 27, 1964 plaintiff had received total "payments" of $1,434,635.09 ($1,309,635.09 of which represented proceeds of collateral sold by USOA and proceeds of a partial assignment of a claim against the United States), which amounted to more than the first 14 scheduled note installments of $69,000 each. This overpayment, they claim, constituted a modification of the agreements they guaranteed and they are thereby released from any liability. This defense is without merit.

The loan agreement specifically provides that all proceeds from the sales of collateral by USOA and the assigned Government claim were to be treated as mandatory "prepayments" and, as such, were to be applied to the installments coming due under the note in the inverse order of their maturity unless Heller consented and agreed to some other application. Since the uncontradicted evidence at trial shows that Heller never consented to any other manner of application of these proceeds, USOA made no overpayments. In fact, as of February 27, 1964 USOA had only made actual "payments" totalling $125,000 against the total of $966,000 that was due on the first 14 monthly installments of $69,-000. The proceeds of the sales of collateral and the Government claim, when applied to the installments in their inverse order of maturity, are not sufficient to make up the difference.

■ Even if the underlying agreement between Heller and USOA had been modified the defendants would not be discharged from their guaranties since they specifically consented to modifications of the relevant agreements by the very terms of their guaranties. Cf., Indianapolis Morris Plan Corp. v. Karlen, *supra*. The determinative language of defendants' guaranties is as follows:

"[Defendants] do hereby jointly and severally unconditionally guarantee to [plaintiff] * * * the prompt payment in full at maturity and all times thereafter (waiving notice of nonpayment) of any and all indebtedness, obligations and liabilities of every kind or nature (both principal and interest) now or at any time hereafter owing to [plaintiff] by [USOA] * * * and the prompt, full and faithful performance and discharge by [USOA] of each and every the [sic] terms, conditions, agreements, representations, warranties, guaranties and provisions on the part of [USOA] contained in any such agreement or arrangement *or in any modification or addenda thereto or substitution thereof,* * * *." (Emphasis added)

## VI.

■ Finally, defendants have raised the claim that their guaranties lack consideration. It is settled law that a contract of guaranty entered into concurrently with the principal obligation is

528

supported by the same consideration which underlies the principal contract. See e. g., Erie County Savings Bank v. Coit, 104 N.Y. 532, 11 N.E. 54 (1887); Beacon Hold. Corp. v. Sparinger, 256 App.Div. 606, 11 N.Y.S.2d 48 (1st Dep't. 1939).

## VII.

Through the testimony of Duncan, Kimmelman, Mindich and Black, supported by numerous exhibits maintained by plaintiff in the course of its business, plaintiff has established that the guaranteed indebtedness sued upon was $166,-017.44, as of January 22, 1972.

The various debits to the defendants' account since November 15, 1966—the effective date of Referee Lipkin's Findings of Fact, Conclusions of Law and Order—consist primarily of attorneys fees, insurance costs and expenses of sales of collateral. They were directly related to plaintiff's post-default collection efforts against USOA and the several guarantors including the defendants and I find them reasonable in amount.

Plaintiff has also properly charged the USOA account with interest at the rate of 12½% per annum on all outstanding amounts other than on accrued interest owing to the plaintiff. Plaintiff has credited the USOA account with certain net collections received by plaintiff since November 15, 1966 from sales of collateral. These collections were properly applied by plaintiff first to the reduction of accrued interest and then to the reduction of principal, including plaintiff's costs and expenses of collection. Accordingly, as of January 22, 1972, the outstanding indebtedness owing to plaintiff on the USOA account by defendants pursuant to their respective guaranties was $166,017.44.

The foregoing shall constitute my findings of fact and conclusions of law in compliance with Rule 52(a) Fed.R. Civ.P.

The parties may submit a judgment in accordance with the opinion herein.

So ordered.